**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

In the Matter of the Marriage of:

AMANDA L. TILLINGHAST,

               Respondent,

      and

ANDREW D. TILLINGHAST,

               Appellant.

No. 82969-6-I

DIVISION ONE

UNPUBLISHED OPINION

MANN, J. — Andrew Tillinghast appeals a parenting plan and child support order relating to his son, KT, and a restraining order entered for the protection of his former spouse, Amanda Tillinghast.[1]  Andrew argues the trial court erred (1) by restricting his residential time with KT under RCW 26.09.191, challenging the sufficiency of the evidence of the trial court's findings of his abusive use of conflict and history of domestic violence, (2) by requiring Andrew's visits with KT to be supervised until he executes a release of information permitting Amanda to access certain specified information from Andrew's mental health providers, (3) in issuing a restraining order for

---

[1] To avoid confusion, we refer to the parties by their first names.  We intend no disrespect.

Amanda's protection, challenging the sufficiency of evidence of the trial court's finding of a reasonable likelihood of family violence in the absence of such an order, (4) by failing to weigh the statutory criteria under RCW 26.09.187 in adopting the residential parenting time schedule, and (5) in calculating child support.

We affirm.

FACTS

Andrew and Amanda married in August 2014. They have one child together, KT, born in January 2014. Amanda has an older child, A, from a prior relationship. Andrew and Amanda separated in 2018. They shared parenting duties for both KT and A without a parenting plan until Amanda began this dissolution action in 2020. During the pendency of the dissolution, the two children resided with Amanda 70 percent of the time and with Andrew 30 percent of the time under a temporary residential schedule imposed by court order.

Based on Amanda's allegations of domestic violence and mental health concerns about Andrew, a court commissioner ordered Andrew to undergo a mental health assessment, to meet with a therapist every two weeks to address the assessment's results and to "work to establish appropriate social boundaries." The court also ordered the appointment of a guardian ad litem (GAL) to investigate Amanda's allegations, as well as statements Andrew had made that he was dying of cancer and suffered from a collapsed lung, and mutual allegations each parent raised about the other's drug or alcohol abuse.

At a five-day bench trial that began in June 2021, the trial court heard testimony from Andrew, Amanda, their relatives, Andrew's current pastor, and one of Andrew's

friends.  The court also heard testimony and admitted into evidence a 45-page report from the court-appointed GAL, Julia Jensine, and a psychologist retained by Andrew to perform a mental health evaluation, Dr. Daniel Singer.

The evidence at trial revealed that Amanda left the marriage after calling the police during a domestic dispute that led to the police escorting Andrew from the family home.  According to Amanda, the incident involved Andrew locking her in the laundry room for two hours while he ranted at her about various grievances.  Amanda testified that incident was her "breaking point" that led her to leave the marriage.  The GAL, in both her report and in her testimony at trial, concluded that this incident was not an isolated event.  She concluded that Andrew had engaged in various tactics throughout the marriage to "minutely control Amanda's day-to-day behavior," including threats, intimidation, financial deprivation, emotional and verbal abuse, lying, gaslighting, emotional and verbal abuse of the children, isolation of Amanda from her family and friends, sabotage of Amanda's efforts to obtain a dental hygiene degree, and using the children as pawns to make Amanda feel guilty.

While there is no evidence Andrew physically hurt Amanda, the evidence showed that he made her fear such violence.  Amanda testified that during one Christmas Eve, Andrew began drinking liquor straight from the bottle and yelled at her, while the two boys watched, crying.  She also testified that, at times, Andrew would keep her up all night yelling at her, making it difficult for her to get enough sleep to function at work or school.  Amanda testified that before separating, she and Andrew attempted marriage counseling with a counselor named Heidi Halsey.  The counselor described Andrew as a "narcissist" and "sociopath," and advised Amanda to leave him immediately.

-3-

Amanda also explained how, after they separated, Andrew began a relentless campaign of harassment and intimidation. Amanda recounted to the GAL that when she asked Andrew not to return to the home after the police ordered him to leave, he told her that the house was not hers, that her sister, Adrienne, needed to leave, and if she did not "come to [her] senses," the "[p]ower, water, gas, internet, go away." He then used the internet to remotely turn the house lights on and off remotely.

The couple purchased a Jeep for Amanda's use before they separated but the vehicle title was only in Andrew's name. When Amanda did not agree to his demands to see the boys on Christmas Day, Andrew threatened to call the police and tell them she had stolen the vehicle. He also threatened to call 911 and claim that she had kidnapped the children. He sent her photographs of himself wearing a Grinch mask, in which he used one hand to flip her off and the other hand to hold his crotch. In text behind the Grinch mask are the words "Give me full custody of both and I'll go away. You never have to see me again."

Amanda also testified that Andrew regularly used the children for information about her asking them if she was bringing men home. He watched her Facebook page and wrote her repeatedly asking about men who were identified as "friends" on her page. The GAL concluded, after reviewing the communications between the parties, that Andrew was obsessed by the thought of Amanda engaging in sex with other men and made "outlandish accusations of infidelities" based on benign Facebook and Twitter entries.

One theme of the GAL report and trial testimony was Andrew's economic abuse of Amanda. For the first year and a half of their separation, Andrew regularly denied

Amanda access to money for the children. Amanda explained to the court how Andrew withheld funds from her hoping he could convince her to reconcile. Amanda had to plead with Andrew for financial support and he would periodically send her money via Venmo but when he chose to send it, in an amount he decided to send. When Amanda told Andrew she lacked funds to buy the children Christmas presents, he told her he would take the children from her if she could not afford to feed them. Because she had no court-ordered child support at the time, the amount he sent her was insufficient for her and the children's needs and it was always up to Andrew whether she would receive anything. Amanda and the children were, as she described it, "at his mercy." She admitted she did tell him she would come home and he sent her $2,000 as a result.

The GAL concluded that Andrew was using his superior financial situation to control Amanda. She relied for this conclusion, in part, on an incident involving the parties' tax returns. According to the GAL, Amanda informed her that after the parties separated, Amanda went to Andrew's house to help do their tax return. She left, however, when they got into an argument and she left the tax information behind. Andrew signed her name to the tax return without her knowledge or permission. When Andrew received the $16,000 tax refund, he did not give Amanda any of these funds. The parties agreed that in lieu of spousal support, Andrew would pay Amanda a lump sum of $8,000, equivalent to her share of this tax return.

Another focus of trial was Andrew's mental health. Amanda testified that Andrew had been behaving erratically and was not stable enough to parent KT. The GAL supported this testimony. The GAL confirmed, by reviewing Andrew's medical records, that he had been diagnosed with bipolar disorder, type 2. Andrew also provided the

GAL with medical records indicating past psychiatric diagnoses of obsessive-compulsive disorder, generalized anxiety disorder, attention deficit hyperactivity disorder, and posttraumatic stress disorder, and alcohol use disorder. The GAL noted that Andrew had admitted to having been diagnosed with borderline personality disorder and considered Andrew's behavior to be consistent with that mental illness. Andrew told the GAL and confirmed at trial that he had been prescribed Seroquel since October 2019.[2]

The GAL testified that she had been ordered to look into Andrew's physical health because he had claimed in texts that he was dying of cancer. She could find no proof of any such diagnosis in any of his medical records and concluded he made such statements in an effort to convince Amanda to reunite with him out of sympathy. Andrew also asserted to the GAL that he suffered from partially collapsed lungs. But, again, there was no corroboration in any records of such a medical problem.

Finally, both Amanda and the GAL described an incident in October 2018 in which Andrew called Amanda, claiming he was going to commit suicide. He asked Amanda to bring the children to the boat he was renting to "save" him. When Amanda refused, he called a suicide crisis line. The crisis line called the police who took Andrew to the hospital for evaluation. The police contacted Amanda and informed her that he claimed he had taken a handful of pills in an attempted suicide. The hospital tested Andrew's urine and concluded he had not taken enough medication to kill himself. The

---

[2] Seroquel is the brand name for quetiapine fumarate, an atypical antipsychotic drug used to treat bipolar disorder. PHYSICIANS' DESK REFERENCE S-807-08 (71st ed. 2017).

GAL concluded he "faked a suicide attempt in order to get his wife to reunite with him and he involved the children in it."

The GAL learned Andrew had received some type of psychological treatment through the Veteran's Administration. She asked Andrew repeatedly to execute a release of information to permit her access to these records but "[h]e had one excuse after another, but the end result of it was that [she] was unable to get those records." According to Andrew, he saw a counselor, Erika Paduano-Karch, in October and November 2019 and again between February and June 2020. The GAL attempted to interview her but despite multiple attempts to reach her, Paduano-Karch never returned her phone calls. Because of the inconsistencies in Andrew's description of his mental health diagnoses and past treatment, and his noncompliance with a court order requiring a mental health evaluation, the GAL asked him to undergo a forensic psychological assessment and referred him to three professionals for this evaluation. But Andrew consistently refused this request unless he was allowed to control the process.

In August 2020, after Andrew received the GAL report, he hired Dr. Daniel Singer to perform a mental health evaluation. Dr. Singer diagnosed general anxiety disorder but no other mental illnesses. But Dr. Singer testified he was not provided the GAL report to review as a part of his evaluation, was unaware Andrew was taking Seroquel, and had not reviewed any of Andrew's prior psychiatric or psychological records.

Because the GAL found Andrew to have engaged in abusive use of conflict with the children and acts of domestic violence against Amanda in front of the children, as well as serious mental health concerns about Andrew's impaired judgment, and his

obsessive and paranoid behavior since the separation, the GAL considered him too dangerous to be with the children unsupervised. The GAL recommended a restraining order protecting Amanda from all contact with Andrew, supervised visitation until Andrew obtained mental health treatment and a domestic violence assessment and treatment, and an award of sole decision-making to Amanda.

The trial court issued the final parenting plan for KT on July 12, 2021. The plan adopted some, but not all of the GAL's recommendations. The court found that Andrew had a history of domestic violence and that he had used conflict in a way that may cause serious damage to KT's psychological development. The court ordered Andrew to begin mental health treatment and to comply with all treatment recommendations. The court also found that Andrew's parenting time should be supervised by a professional visitation supervisor and limited to every other weekend on Saturday and Sunday until Andrew identified his mental health treatment providers and signed releases of information to allow Amanda to obtain a report, oral or written, of Andrew's treatment plan, compliance with the treatment plan, and attendance at appointments. The court stated that if, during the first six months of the plan, Andrew either failed to comply with the disclosure requirements or failed to comply with his mental health treatment, his parenting time would revert to supervised.

If Andrew complied with the disclosure requirement and remained in compliance with his mental treatment, the parents would share residential time 70 percent with Amanda and 30 percent with Andrew with rotating school breaks and holidays and up to one week of uninterrupted summer vacation with each parent.

The trial court granted sole decision-making to Amanda except for KT's participation in extracurricular activities, giving each parent the discretion to make decisions about such activities during their respective residential time.

The trial court entered a child support order requiring Andrew to pay monthly support of $1,707.39.

The trial court also granted Amanda's request for a restraining order prohibiting Andrew from having contact with Amanda for three years. The order explicitly limited the parties' contact:

> Except as detailed in their final parenting plan, the parties will not communicate with each other or have in-person contact and if one party appears in a public setting where the other party is already present, the last party to arrive shall leave immediately.

Andrew appeals the parenting plan, the restraining order, and the child support order.

## ANALYSIS

### Parenting Plan

Andrew raises three arguments related to the parenting plan. First, he contends the court lacked an evidentiary basis for finding an abusive use of conflict or history of domestic violence and thus erred in imposing any restrictions on his parenting time under RCW 26.09.191. Second, he argues that the trial court erred in not evaluating the statutory factors for establishing a parenting plan under RCW 26.09.187. Finally, he maintains the trial court's mental health disclosure requirements impinge on his constitutional right to privacy and are not reasonably calculated to prevent harm to KT. We address each argument in turn.

1. <u>Factual Support for RCW 26.09.191 Restrictions</u>

   a. <u>Finding of Domestic Violence</u>

A trial court wields broad discretion when fashioning a permanent parenting plan. In re Marriage of Katare, 175 Wn.2d 23, 35, 283 P.3d 546 (2012). Generally, when creating a permanent parenting plan in a dissolution action, courts will set a residential schedule for the children based on certain statutory considerations. See RCW 26.09.187(3). But RCW 26.09.191(2) provides certain factors that, if present, impose a mandatory duty on the court to limit residential time. In re Marriage of Underwood, 181 Wn. App. 608, 614, 326 P.3d 793 (2014).

RCW 26.09.191(2)(a) provides in pertinent part:

> The parent's residential time with the child shall be limited if it is found that the parent has engaged in any of the following conduct: . . . (iii) a history of acts of domestic violence as defined in [former RCW 26.50.010].

At the time of trial in this case, "domestic violence" was defined as "[p]hysical harm, bodily injury, assault, or the infliction of fear of imminent physical harm, bodily injury, or assault, or stalking as defined by RCW 9A.46.110" of one intimate partner by another or by one family or household member by another.[3] Former RCW 26.50.010(3) (2020). "Stalking" is defined as "intentionally and repeatedly harass[ing] or repeatedly follow[ing] another person," placing that person in fear that the stalker intends to injure her or

---

[3] RCW 7.105.010(9) currently defines domestic violence more broadly: "[p]hysical harm, bodily injury, assault, or the infliction of fear of physical harm, bodily injury, or assault; nonconsensual sexual conduct or nonconsensual sexual penetration; <u>coercive control</u>; <u>unlawful harassment</u>; or stalking" of an intimate partner, family member, or household member. (Emphasis added). "Coercive control" is defined as "a pattern of behavior that is used to cause another to suffer physical, emotional, or psychological harm, and in purpose or effect unreasonably interferes with a person's free will and personal liberty." RCW 7.105.010(4)(a). As this was not the statute at the time of trial, we must apply former RCW 26.50.110 instead of RCW 7.105.010.

another, and the stalker either "intends to frighten, intimidate or harass" the person or knows or reasonably should know that the person is afraid, intimidated, or harassed "even if the stalker did not intend to place the person in fear or intimidate or harass" the other. RCW 9A.46.110(1).

The trial court found that Andrew has a history of domestic violence, that Amanda was the victim, and that Amanda credibly testified that she feared for her safety. As a basis for imposing .191 restrictions on Andrew's parenting time, the trial court found:

> At trial, Mother presented evidence of Father's long-term challenges with mental health, including multiple past diagnos[e]s of various mental health conditions. She testified about her observations as to Father's mental health throughout their relationship. She also testified she was afraid for her safety. [The] Court finds Father has been diagnosed with mental health conditions and based on Father's behavior at trial and excessively litigious behavior throughout the case, . . . that Father's control issues affect his behavior and ability to parent the child.
>
> The Court finds Mother credible with regard to her testimony as to acts of domestic violence aimed at her by Father.
>
> The Court finds Father was jealous of Mother, threatened to kill himself, and caused her to experience reasonable fear that Father was stalking her. Father did not deny using the children to gain access to Mother . . .; manipulating the parents' finances . . .; and refusing to return Mother's pets even when Mother requested Father to return the pets to her. The Court finds a pattern of controlling behavior by Father, which includes use of the children to control Mother. Mother's fear of Father is legitimate, and it appears likely Father will resume acts of domestic violence if the Court does not enter a restraining order.

We review these findings for substantial evidence. Katare, 175 Wn.2d at 35. Evidence is substantial when it persuades a fair-minded person of the truth of the matter asserted. In re Marriage of Black, 188 Wn.2d 114, 127, 392 P.3d 1041 (2017). We do not review the trial court's credibility determinations or weigh conflicting evidence, "even

though we may disagree with the trial court in either regard." Black, 188 Wn.2d at 127 (quoting In re Welfare of Sego, 82 Wn.2d 736, 740, 513 P.2d 831 (1973)).

Andrew argues that Amanda presented no evidence that he ever physically assaulted her. But even when there is no evidence of a direct assault, fear of violence is a form of domestic violence that will support a restriction under RCW 26.09.191. Maldonado v. Maldonado, 197 Wn. App. 779, 791, 391 P.3d 546 (2017). Stalking is also explicitly included within the definition of domestic violence and requires no proof of an actual physical assault. Indeed, attempts to contact or follow a person after being given actual notice that the person does not want to be contacted or followed constitutes prima facie evidence that the stalker intends to intimidate or harass the person. RCW 9A.46.110(4). "Contact" includes any form of communication, including electronic communication. RCW 9A.46.110(4).

There is substantial evidence in this record to support the trial court's findings that Andrew, both before the couple separated, and in the intervening period before trial, inflicted a fear of imminent physical harm and intentionally and repeatedly harassed Amanda in a way that caused her to fear physical harm from him. Amanda testified how Andrew's erratic and controlling behavior during the marriage led her to fear for her and her children's safety. She described a Christmas Eve incident in which Andrew yelled and screamed at her, frightening both her and the children. Amanda stated that when they were married, he would keep her up all night yelling at her. Amanda's mother, Debbie Erwin, testified she witnessed Andrew pinning A down on a bed, straddling him, holding his arms down, and screaming an inch from his face. A was very scared, upset, and crying. Amanda also testified about what she described as

the final episode that led her to leave the marriage in which Andrew locked her in the laundry room for two hours while yelling at her in front of the children.

After Amanda left Andrew, she repeatedly asked him to stop harassing her through electronic communications. In one set of texts, Andrew asked Amanda to go on a yacht he had rented and to bring the children for a "little family vacation," messages which she found scary because they had separated and she had no intention of reconciling, Andrew had never driven a boat in his life, and his messages to her exhibited "delusional thinking." He then began to send her messages, repeatedly, asking her to go on the Dr. Phil show with him. He had someone call her, representing himself as a member of the "Dr. Phil Production." Despite telling Andrew she had no interest in participating, he was "obsessive" about it, repeatedly raising the topic for two months.

Amanda also described how she felt he was following and spying on her. He asked her once why she had flowers in her apartment. Given that Amanda lived in a fifth-floor apartment, she could not understand how he could have seen the flowers without using binoculars. Andrew refused to allow Amanda to have regular phone calls with the children when they were at his home, insisting that the children speak with her on Facetime. He would then ask to see what she was wearing and ask her if she was going out on a date. He would make comments about her hair style. According to the GAL, after the couple separated, the written communication between Andrew and Amanda indicated he was obsessed over whether Amanda was seeing other men.

The GAL identified several actions on Andrew's part "clearly meant to strike fear into her," including threatening to shut the power, water, and gas off in the home if she refused to reconcile with him. The GAL wrote

> [Andrew] frequently tells or shows Amanda that she cannot escape him. He showed up at the daycare with no credible explanation, she has come home several times to find him waiting in her apartment parking lot, he texted her several times in such a manner to make her fear that he knew where she was and what she was doing . . . , he has threatened several times to take the kids away from her and he sent her creepy photos demanding she give him custody, he used [a children's video game] to spy on his kids and/or Amanda's family while the kids were playing over there . . ., he has written her many hundreds of texts that are by turn crazy-sounding, inconsistent, frightening, and abusive.

The GAL reported that she "had seen hundreds of texts, Facebook messages, and e-mails with similar themes, as well as listened to recordings of him harassing her in person." The GAL testified she heard one phone recording in which Andrew was "clearly in a rage," making accusations against Amanda that made no sense. The GAL also reported that "[Andrew] does not leave her alone despite her very clear messages to do so." This evidence supports the trial court's finding that Andrew had engaged in domestic violence against Amanda.[4]

The trial court's finding of a history of domestic violence is supported by substantial evidence and a mandatory basis for imposing limits on Andrew's parenting time under RCW 26.09.191.

---

[4] Andrew also challenges the sufficiency of the evidence that he has been diagnosed with mental health conditions. The record, however, supports a finding that Andrew has in fact been diagnosed in the past with bipolar disorder, obsessive compulsive disorder, generalized anxiety disorder, and posttraumatic stress disorder.

b. Finding of Abusive Use of Conflict

Although the finding of domestic violence requires restrictions in a parenting plan, RCW 26.09.191(3)(e) also gives a trial court the discretion to impose such restrictions if it finds that a parent has engaged in "the abusive use of conflict which creates the danger of serious damage to the child's psychological development." Under this section, a showing of actual damages or alienation is not required. "Rather, the required showing is that a danger of psychological damage exists." Burrill v. Burrill, 113 Wn. App. 863, 872, 56 P.3d 993 (2002).

The trial court found that Andrew used conflict in a way that may cause serious damage to KT's psychological development. Based on this finding and its finding of domestic violence, the court granted sole decision-making to Amanda. Andrew argues there is insufficient evidence to support the trial court's finding that he engaged in an abusive use of conflict. We disagree.

First, there is evidence that Andrew allowed his desire to control Amanda to interfere with sound decision-making relating to the children. Amanda testified about a disturbing incident in late December 2018 during which the older son, A, became ill and Amanda wanted to take him to the hospital. Andrew, who had allowed the family's insurance to lapse (something he had threatened he would do if she left him), refused to take him and insisted that Amanda not do so either. When she took A to the hospital, however, the provider immediately transported A by ambulance to Seattle Children's Hospital where they diagnosed a serious abscess. Amanda learned that had she not obtained medical attention for A when she did, the child's airway could have been compromised. Andrew's reaction to Amanda disobeying him was to repeatedly send

her angry text messages, including one in which he called her a "whore," and falsely accused her of "dumping" the kids off "so [she] could get laid."

Andrew continued to insist to the GAL that the hospitalization was unnecessary:

On New Year's Eve 2018, Amanda took [A] to the Urgent Care against [Andrew's] protestations. The Urgent Care called an ambulance to have [A] transported to the hospital. The ultimate bill was $26,799.99, almost all of which was forgiven. Regarding that incident, [Andrew] wrote to me that ". . . she doesn't know what to do if they're ill. Was responsible for a hospital stay [A] had and didn't need, that cost me thousands of dollars. Her and her sister both had bankruptcies due primarily to bad management in medical crises. Her family doesn't understand insurance. That is a big worry, if she's given free reign [sic] on decisions, and I'm on the hook for 70% of bills. She can go out of network for example just because she doesn't understand." He further explained that [A] had simply had a mild concussion. They had no insurance at that time but on January first they would have, so he wanted to watch [A] until they had insurance and then take him to an urgent care clinic if needed. Against his protests, Amanda took [A] to the hospital, where the child was admitted and kept for three days.

Amanda submitted a photo of the whiteboard from the hospital room. It lists two diagnoses: retropharyngeal abscess (fluid collection behind the throat) and cervical lymphadenitis (enlarged neck/lymph). The medications listed are intravenous Clindamycin and NSAIDS for fever and pain. I looked up cervical lymphadenitis; it is usually caused by a strep or upper respiratory infection. There is not the least reason to believe that a mild concussion could possibly have been the cause here. Amanda related that the doctor said it was lucky she brought [A] in before his airways were cut off by the infection. She said the doctors were watching to see whether he needed surgery but he did not need it in the end.

. . . .

Had Amanda listened to [Andrew], the child would not have received intravenous antibiotics and might have suffered an obstructed airway. Thus, [Andrew] endangered his child's physical health and possibly his life by attempting to prevent medical care.

Second, on at least two occasions, Andrew used his conflict with Amanda to turn the children against her. In one incident, Amanda testified that Andrew told one of the children to ask Amanda why she had hung up on them, when in fact she had not disconnected but lost reception when her cell phone battery died. On another occasion, Amanda agreed to let Andrew have the children on Christmas after which Andrew led the boys to believe that she had "abandoned" them on the holiday.

Finally, during trial, the court observed Andrew's abusive use of conflict first-hand. As the court described in its findings:

> During trial, [A] began sending a group text to Father and [KT]. Father's phone began pinging over and over. Mother had [KT's] phone and received the same pings over and over. Mother turned off the phone. When Mother turned on the phone during the recess to find out what happened, Mother discovered Father had replied to the children that [A] was "spamming the judge." Mother was outraged because she has made her best effort to avoid talking to [A] and [KT] about these proceedings. Father apologized and excused his behavior as a knee-jerk reaction.

> Given the children were transitioning to Mother's care that afternoon, Father created a distressful situation for Mother to resolve with the children.

Amanda's testimony, the GAL report, and the court's own observations of Andrew's conduct during trial, support the finding that Andrew engaged in abusive use of conflict consistent with RCW 26.09.191(3)(e).

2. Analysis of RCW 26.09.187 Factors

Andrew next argues finally that the trial court failed to meaningfully address the factors set out in RCW 26.09.187(3) before entering the residential provision in the parenting plan. We disagree.

RCW 26.09.187(3)(a) provides:

The court shall make residential provisions for each child which encourage each parent to maintain a loving, stable, and nurturing relationship with the child, consistent with the child's developmental level and the family's social and economic circumstances. The child's residential schedule shall be consistent with RCW 26.09.191. Where the limitations of RCW 26.09.191 are not dispositive of the child's residential schedule, the court shall consider the following factors:

(i)     The relative strength, nature, and stability of the child's relationship with each parent;
(ii)    The agreements of the parties, provided they were entered into knowingly and voluntarily;
(iii)   Each parent's past and potential for future performance of parenting functions . . ., including whether a parent has taken greater responsibility for performing parenting functions relating to the daily needs of the child;
(iv)    The emotional needs and developmental level of the child;
(v)     The child's relationship with siblings and with other significant adults, as well as the child's involvement with his or her physical surroundings, school, or other significant activities;
(vi)    The wishes of the parents and the wishes of a child who is sufficiently mature to express reasoned and independent preferences as to his or her residential schedule, and
(vii)   Each parent's employment schedule, and shall make accommodations consistent with those schedules.
Factor (i) shall be given the greatest weight.

While establishing the residential schedule in a permanent parenting plan generally requires consideration of the best interests of the child factors, RCW 26.09.191 restrictions may be dispositive of the child's residence without examination of the best interests of the child factors. RCW 26.09.187(3)(a). In such cases, the RCW 26.09.187(3) best interests of the child factors are essentially unnecessary. In re Marriage of Farrell-Milosavljevic, No. 76403-9-I (July 16, 2018) (unpublished), https://www.courts.wa.gov/opinions/pdf/764039.PDF. Here, the trial court limited Andrew's residential time with KT under RCW 26.09.191(2), requiring supervised visitations until Andrew followed the mental health evaluation and treatment

-18-

requirements set out in the parenting plan, rendering a full best interests of the child analysis under RCW 26.09.187(3) unnecessary.

But the trial court did evaluate the .187(3) factors in establishing the 70/30 residential schedule that goes into effect once Andrew demonstrates compliance with his mental health treatment. The trial court found that KT has a strong relationship with his brother, A, and that the brothers are "tightly bonded." It found that KT also has strong relationships with his grandparents, aunts and uncles, cousins, and friends. It further found that KT has always lived with his parents, enjoys a strong and stable relationship with each parent, and should continue to have consistent contact with each parent. While the court expressed concerns about Andrew's ability to meet KT's emotional and development needs, it nevertheless found that both parents were capable of keeping KT safe and meeting his daily needs. The court noted that KT had moved back and forth between the parents' homes under a 70/30 residential schedule imposed by court order. The court also considered each parent's work schedule, noting that Amanda was working up to six days a week as a dental assistant to make ends meet, and Andrew was working as an IT professional and had worked for the same company for two years. The court finally considered the parents' respective requests for a residential schedule.

We conclude the trial court considered the factors set out in RCW 26.09.187(3) when fashioning the 70/30 residential schedule implemented in the final parenting plan.

### 3. Mental Health Treatment Disclosure Requirements

Andrew's final challenge to the parenting plan relates to the trial court's imposition of supervised visitation and the requirement that Andrew disclose to Amanda

his mental health treatment providers' names and treatment plan details as a condition to moving from supervised visitation to the unsupervised 70/30 residential schedule.

Under RCW 26.09.191(2)(m)(i), the trial court may impose restrictions "reasonably calculated to protect the child from the physical, sexual, or emotional abuse or harm that could result if the child has contact with the parent requesting residential time." The limitations may include "[s]upervised contact between the child and the parent or completion of relevant counseling or treatment." The trial court ordered Andrew to start mental health treatment and to comply with any recommendations of his treatment providers. Andrew does not appear to challenge this aspect of the parenting plan.

Andrew argues, however, that the trial court abused its discretion in giving Amanda access to his mental health treatment providers and information about his treatment. He contends this condition impinges on his constitutional rights and is not reasonably calculated to protect KT from any harm as required by RCW 26.09.191(2)(m)(i). We disagree with both arguments.

First, a parent's rights may be subject to limitation to protect a child. Wisconsin v. Yoder, 406 U.S. 205, 233-34, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972). RCW 26.09.191(2) and (3) reflects the legislature's recognition of this fact. Indeed, RCW 26.09.191 provides that a trial court may preclude a parent's residential time altogether if certain factors exist. See Underwood, 181 Wn. App. at 611.

Here, the court relied on several statutory factors under RCW 26.09.191(2) and (3) in imposing supervised visitation. Andrew participated in the trial and was aware of the possibility that the court would impose parental restrictions. Andrew does not argue

that the trial court lacked authority to place limits on his residential time, does not challenge the constitutionality of RCW 26.09.191 on its face, or question the constitutional validity of the statute as applied to him. He presents no reasoned argument to support his assertion of a violation of his constitutional rights.

Moreover, the statute does not require a specific finding with regard to the necessity of supervised contact. Upon a finding of a history of domestic violence under RCW 26.09.191(2), parental restrictions are mandatory and the statute expressly provides that those restrictions may include supervised contact. RCW 26.09.191(2)(m)(i). In this case, supervised contact does, in fact, minimize opportunities for Andrew to engage in conflict with Amanda, shelters KT from the effects of that conflict, and ensures a safe environment for KT during Andrew's residential time. The limitations are reasonably calculated to prevent harm to KT.

Second, the supervised visitation is limited in duration and Andrew will have unsupervised residential time as soon as he begins mental health treatment and demonstrates his compliance with his treatment providers' recommendations. This requirement is also reasonably calculated to protect KT because Andrew demonstrated, throughout his interaction with the GAL, that he was not candid with her or Dr. Singer about his mental health records, past mental health diagnoses, the identity of his treatment providers, or his compliance with any recommended treatment plans. The court specifically found:

> The Court is concerned about the limited nature of the mental health evaluation obtained by Father, his failure to provide any signed release for his medical records to the GAL, and the uncertainty around Father's current status in therapy. Father will be required to provide a list of his

> treatment providers and a signed release from those providers to verify facts about Father's treatment.

This requirement is a direct result of Andrew's refusal to give the GAL such a signed release for his Veteran's Administration records, where Andrew testified he is currently receiving psychological treatment.

Andrew complains that the provision of the parenting plan that allows his mental health providers to determine whether he should undergo a domestic violence assessment or participate in domestic violence treatment is based on concerns raised by Amanda. He argues that this provision constitutes an impermissible delegation of authority to modify the parenting plan, citing to Kirshenbaum v. Kirshenbaum, 84 Wn. App. 798, 929 P.2d 1204 (1997). In that case, an arbitrator suspended the mother's visitation rights under a provision of a parenting plan that allowed the arbitrator to do so if it found she was teaching the children not to trust their father, their doctors, or the GAL. Kirshenbaum, 84 Wn. App. at 802. The court held that a trial court has the discretion to authorize an arbitrator to suspend visitation rights because the suspended parent has the right of court review. Kirshenbaum, 84 Wn. App. at 804.

Kirshenbaum does not support Andrew's argument here. First, the trial court did not give any third party the authority to suspend his visitation rights. Second, if any treatment provider were to recommend that Andrew undergo a domestic violence assessment or attend DV Dads based on information Amanda shared with his treatment providers, he has the right to seek court review of any such treatment recommendation.

Finally, the parenting plan makes it clear that Amanda does not have the right to seek unfettered access to Andrew's mental health records. The provision of the plan

limits her access to (1) a list of all current mental health treatment providers, including any providers at the Veteran's Administration; and (2) a signed release of information from each provider authorizing Amanda to obtain a report about Andrew's treatment plan, compliance with the plan, and attendance at appointments. The plan explicitly states that "Mother is not otherwise allowed access to Father's medical records without a court order." This restriction is reasonably calculated to allow Amanda to verify that Andrew is obtaining the court-ordered mental health treatment such that he can move from supervised visitation to unsupervised residential time.

We also conclude the disclosure requirement is reasonably calculated to prevent emotional harm to KT. As the court explained in its findings, Andrew demonstrated a lack of impulse control and poor decision-making throughout the pendency of the dissolution proceeding. In March 2021, the trial court entered an order restricting Andrew's contact with the court after he attempted to make inappropriate ex parte contact with the court "by repeatedly failing to include the Guardian ad Litem appointed in this matter on e-mail correspondence with the Court."[5] The court had to limit the parties to no more than one e-mail or telephone call to the court each day and required all e-mail correspondence to be sent to all parties. During trial, the court had to admonish Andrew for texting his children regarding the court proceedings. The court found, based on these incidents, that Andrew's "control issues affect his behavior and ability to parent the child." The court was within its discretion to order that Andrew undergo mental health treatment to prevent harm to KT and to require that he verify his

---

[5] Andrew argues on appeal that there is no evidence to support this finding. He did not, however, assign error to the March 18, 2021 order in which the trial court made this finding and we decline to consider his challenge to the order in this appeal.

-23-

compliance with the treatment obligation with Amanda before permitting him to have unsupervised residential time with KT.

Restraining Order

Andrew next argues that the trial court abused its discretion in granting a restraining order, challenging the sufficiency of evidence of the court's finding of a "reasonable likelihood of family violence." We reject this argument.

RCW 26.09.050(1) provides that a court may, in dissolving a marriage, enter a restraining order, a domestic violence protection order or an antiharassment order. Under RCW 26.09.050(2), a restraining order issued may restrain one party having any contact with the protected party. Courts in dissolution proceedings have broad statutory and equitable authority to impose and fashion restraining orders. Blackmon v. Blackmon, 155 Wn. App. 715, 721-22, 230 P.3d 233 (2010) (protection and restraining orders are essentially a type of injunction and are equitable in nature). We review a trial court's decision to impose a restraining order for abuse of discretion. In re Marriage of Freeman, 169 Wn.2d 664, 671, 239 P.3d 557 (2010).

Here, the trial court had a reasonable basis for imposing a restraining order. The trial court found

> Mother gave credible evidence that Father has a history of domestic violence and when coupled with Mother's credible evidence about Father's continued abusive use of conflict, including excessive text messages and emails to harass, overwhelm and intimidate Mother, the Court finds a reasonable likelihood family violence will occur in the future.

The sole argument Andrew raises on appeal is the lack of evidentiary support for the finding that there is a reasonable likelihood that he will commit "family violence" in the future.

-24-

But we read this finding to refer back to the court's finding of "domestic violence," which does not require evidence that Andrew has or will act violently toward Amanda. The record does support the court's findings that Andrew sent Amanda an excessive number of text messages and e-mails and that these communications were intended to harass, overwhelm, or intimidate her. The GAL report describes in great detail the number and content of these communications, including profanity and belittling comments, such as:

> You are selfish and gross. Start thinking of someone else besides you and start caring for your kids. And if you bring a guy around them you'll lose custody. That car is in my name and I pay every bill. I can file [a] stolen property [report]. So try me if you're gonna be a bitch about that.

Based on the evidence at trial, the trial court had substantial evidence to find that Andrew had engaged in a pattern of harassing and intimidating behavior in an attempt to manipulate and control Amanda. The record shows that Andrew threatened to kill himself, falsely claimed he was dying of cancer, led Amanda to fear that he was stalking her, refused to support his child financially, hoping to convince Amanda to return to the relationship, and refused to return Amanda's dog, Tia, when she asked to take her pet from Andrew's home.

Again, having heard from both parties and evaluating all the evidence, the trial court was in the best position to resolve conflicts and draw inferences from the evidence. We will not interfere with the trial court's credibility determinations or weigh conflicting evidence. Black, 188 Wn.2d at 127. The evidence supports the court's finding that it is likely Andrew would resume his harassment and intimidation of Amanda if not court-ordered to restrain from doing so.

-25-

<u>Child Support Order</u>

Finally, Andrew argues the trial court abused its discretion by deviating upward from the standard child support schedules in its child support order for KT. He contends the trial court lacked an evidentiary basis for the deviation and that the reasons the court gave for it are not permissible under the law. We disagree.

We review a trial court's decision on child support for abuse of discretion, recognizing that such decisions are seldom disturbed on appeal. <u>In re Marriage of Booth</u>, 114 Wn.2d 772, 776, 791 P.2d 519 (1990). A trial court abuses its discretion if its decision rests on unreasonable or untenable grounds. <u>In re Marriage of Schnurman</u>, 178 Wn. App. 634, 638, 316 P.3d 514 (2013).

The child support statute is intended "to insure that child support orders are adequate to meet a child's basic needs and to provide additional child support commensurate with the parents' income, resources, and standard of living." RCW 26.19.001. When setting child support, the trial court begins by setting the basic child support obligation based on the statute's economic table. RCW 26.19.011(1), .020. The economic table is presumptive for combined monthly net incomes up to and including $12,000. RCW 26.19.065(3). "When combined monthly net income exceeds twelve thousand dollars, the court may exceed the presumptive amount of support set for combined monthly net incomes of twelve thousand dollars upon written findings of fact." RCW 26.19.065(3).

The trial court found that the parents' combined net income in this case exceeds $12,000 per month. It found Amanda's net monthly income to be $3,581.56 and

Andrew's net monthly income to be $8,513.81, for a total of $12,095.37. Andrew does not challenge these findings on appeal.

The trial court also found that the standard calculation would require total child support of $1,573.00 per month, consistent with RCW 26.19.020, of which Amanda's share would be $465.61 and Andrew's would be $1,107.39. But the trial court chose to exceed the presumptive amount of support by $600 a month and required Andrew to make a total transfer payment of $1,707.39 per month for KT's support.

The trial court entered findings specifying the reasons for exceeding the economic table:

> The parties have a significant disparity in their current monthly income and in their future earning capacity. In addition, the dissolution created a significant change in expenses for Mother. An upward deviation ($600 per month) is in the child's best interest and will make sure the child experiences a similar lifestyle in both homes.
>
> The Court is entering an upward deviation based on the parties' income (above $12,000), earning capacity, and the best interests of the child based on the factual circumstances of this case.
>
> (A) Parties have agreed to a certain amount of child support ($1,697.23);
>
> (B) A significant financial disparity exists between the parties' households with Mother working six days a week out of the home as a dental assistant for less than $4000/month while Father works from home as an IT professional for over $10,000/month. In addition, Father owns his own home. Father testified he has savings while Mother testified she does not have any savings. Mother credibly testified she could not afford to buy Christmas gifts in December 2020.

Andrew first argues that an income disparity between the parties is not a permissible basis for exceeding the standard child support schedule. But as the Supreme Court held in McCausland v. McCausland, "[t]he statute does not specify any particular method the court must use when exceeding the economic table, nor does it

specify what factors the court should consider in rendering its findings of fact."  159 Wn.2d 607, 616-17, 152 P.3d 1013 (2007).  McCausland explicitly stated that a trial court should consider the "Daubert/Rusch factors"[6] of the parents' standard of living and the child's special medical, educational, or financial needs when deciding to exceed the economic table.  159 Wn.2d at 620.  But the court is not limited to consideration of these factors alone.  McCausland, 159 Wn.2d at 620.

Even if it is inappropriate to consider a parent's income level in deciding whether to exceed the child support schedule, the trial court's reference to the parties' disparity of income here was made in the context of the parents' standard of living and a desire to ensure that KT's standard of living would be the same in both homes.  This reason is permissible under McCausland.

Andrew also contends that owning his own home and having money in his savings account are not bases for the deviation.  But the statute identifying reasons for deviations from the standard calculations under RCW 26.19.075(1)(a)(vi), includes "possession of wealth, including but not limited to savings, investments, real estate holdings and business interests, vehicles, boats, pensions, bank accounts, insurance plans, or other assets."  If these assets may be considered when deviating from a standard child support calculation, we see no reason why they cannot be considered when exceeding the standard economic table under RCW 26.19.065(3).

Finally, Andrew challenges the trial court's reliance on the parties' agreement on child support.  As Andrew correctly notes, he agreed to the total child support amount

---

[6] In re Marriage of Daubert, 124 Wn. App. 483, 99 P.3d 401 (2004); In re Marriage of Rusch, 124 Wn. App. 226, 98 P.3d 1216 (2004).  Both Daubert and Rusch were abrogated by McCausland.

based on the assumption that it included support for Amanda's other son, A. He contends the parties did not agree on child support of $1,697.23 for KT alone. Finally, he argues any settlement agreement the parties had reached as to child support was rescinded by Amanda on the first morning of trial.

The problem with each of these arguments is that in his closing argument at trial, Andrew explicitly stated that if Amanda intended to keep A and KT together for visitation or residential time, "as long as I have access to both kids, I don't have a problem with the child support number." He noted that they "started this case with a financial agreement in place and as long as . . . we're responding to that, I think that's fine." Amanda committed she intended to permit Andrew to have residential time with A "so long as [Andrew] . . . is cooperating and following court orders and as—as long as I think that he is not harming the kids in a mental or emotional way, I intend to keep them together because I think it's important for them and [A] does look out for [KT]." Based on this agreement of the parents at trial, the trial court did not abuse its discretion in relying on the parties' agreement as a basis for exceeding the economic table and requiring Andrew to pay an additional $600 a month in child support.

We affirm.

_____Mann, J._____

WE CONCUR:

_____Coburn, J._____          _____Andrus, C.J._____

-29-